## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JESSICA ADAMS,

     Plaintiff,

                              Case No. 23-11399

v.                             Hon. Jonathan J.C. Grey

SELECT QUOTE, INC.,

     Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RENEWED MOTION FOR DEFAULT JUDGMENT (ECF No. 17)

### I.    INTRODUCTION

This case requires the Court to determine whether plaintiff's allegations of defendant's violations of federal and state civil rights laws as well as federal wage and hour laws entitle plaintiff to default judgment. Because many of the allegations in the complaint are deficient, the Court **GRANTS IN PART AND DENIES IN PART** plaintiff's renewed motion for default judgment. (ECF No. 17.)

### II.    BACKGROUND

Plaintiff Jessica Adams filed a complaint against Defendant Select Quote, Inc. ("Select Quote"), alleging violations of the Americans with

Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Michigan Persons with Disabilities Civil Rights Act, M.C.L. § 37.1101 et seq. ("PWDCRA"), and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"). (ECF No. 1.)[1] Adams began working at Select Quote in November 2021 and spent one and a half months trying to obtain her license to sell insurance. (*Id.* at PageID.2 ¶¶ 7–8.) Based on Select Quote's representations, Adams expected to work as a sales agent and receive an hourly rate of $18 and a per-sale commission of $50. (*Id.* at PageID.3 ¶ 10.) However, Select Quote trained Adams as an enrollment specialist and informed Adams that she would only receive a $10 per-sale commission until she began sales training. (*Id.* at ¶¶ 11–12.)

At some point during her employment, Select Quote sent Adams multiple letters indicating that she would only receive minimum wage and a $15 per-sale commission. (*Id.* at PageID.4 ¶ 18.) One of those letters came in March 2022 when Select Quote informed Adams that

---

[1] The complaint is the only document in this case that details the events preceding the complaint; there are no deposition transcripts, affidavits, responses to interrogatories, or documents produced during discovery. Select Quote also never answered the complaint. Therefore, this section is based solely on the complaint.

there was a typo in her offer letter and that she would receive minimum wage. (*Id.* at PageID.3 ¶ 14.)[2]

During her employment, Adams told Select Quote about her anxiety and depression diagnoses. (*Id.* at PageID.4 ¶ 19.) Adams took leave and requested time off for her conditions as early as January 2022. (*Id.* at ¶¶ 20–25.)

At some point during Adams' employment, Adams' supervisors told her that she could not take breaks from 8:00 a.m. to 1:00 p.m. (*Id.* at PageID.5 ¶ 26.) Select Quote further prohibited Adams from taking any breaks and encouraged her to not take a lunch break and to work after hours without pay. (*Id.* at ¶ 27.) Adams' supervisors once represented during a Zoom meeting that Select Quote would terminate people who raised concerns about pay. (*Id.* at ¶ 28.)

During her employment, Adams met with members of Select Quote's human resources department to discuss pay and disability accommodations. (*Id.* at ¶ 30.) Select Quote's employees did not take Adams seriously and dismissed her issues. (*Id.* at ¶ 31.) Adams

---

[2] The complaint states that this letter came in "March of 2020" after Adams had completed months of training. (ECF No. 1, PageID.3 ¶ 14.) Because the complaint alleges that Adams started in November 2021, the Court infers that the complaint contained a typographical error, and it should have stated that the letter arrived in "March of 2022."

continued to seek accommodations, to no avail. (*Id.* at ¶ 32.) Adams alleges that she was "forced to resign" in May 2022 "as it was not possible for her to continue in her job under the circumstances." (*Id.* at ¶ 33.) Adams filed a charge of discrimination with the EEOC and received a notice of right to sue on March 14, 2023. (*Id.* at PageID.6 ¶ 34.)

Adams filed her complaint in June 2023. (ECF No. 1.) Adams served Select Quote with a copy of the complaint in August 2023. (ECF No. 3.) Adams requested and obtained a clerk's entry of default on October 5, 2023. (ECF Nos. 5, 6.) Adams moved for default judgment in December 2023, but Court denied the motion without prejudice because Adams failed to comply with the Court's orders regarding service. (ECF Nos. 10, 16.) Adams filed a renewed motion for default judgment in August 2024. (ECF No. 17.) The Court held a hearing on the motion in October 2024. (ECF No. 19.) Following the hearing, Adams filed a certification of damages. (ECF No. 21.)

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 55, the Court may enter a judgment of default against a defendant who fails to plead or otherwise

4

defend against an action. Fed. R. Civ. P. 55(a), (b). To obtain a judgment by default, the moving party must first request that the Clerk of the Court enter a default pursuant to Federal Rule of Civil Procedure 55(a). *Shepard Claims Serv., Inc. v. Williams Darrah & Assocs.*, 796 F.2d 190, 193 (6th Cir. 1986).

Upon entry of default, all well-pleaded allegations of the plaintiff's complaint are deemed admitted. *See Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (citations omitted) (noting that an entry of default "conclusively establishes every factual predicate of a claim for relief"). Default judgment is appropriate only if "there [is] a 'sufficient basis in the pleadings for the judgment entered.'" *United States v. $525,695.24*, 869 F.3d 429, 441 (6th Cir. 2017) (citation omitted). "Thus, before entering judgment in favor of the [plaintiff], the district court ha[s] a duty to ensure that the allegations in the . . . complaint [a]re sufficient." *Id.* (citation omitted). The Court must "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Anderson v. Johnson*, No. 98-1931, 1999 WL 1023753, at *2 (6th Cir. Nov. 4, 1999) (citation omitted).

Additionally, default judgment only establishes a defendant's liability; the plaintiff must still establish the extent of unliquidated damages. *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995). The plaintiff bears "the burden of proof for establishing damages." *Flynn v. People's Choice Home Loans, Inc.*, 440 F. App'x 452, 456 (6th Cir. 2011). Even when a default judgment is warranted, the district court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Vesligaj v. Peterson*, 331 F. App'x. 351, 355 (6th Cir. 2009) (internal quotation marks and citation omitted).

## IV.   ANALYSIS

### A. Disability Discrimination – ADA & PWDCRA

In Counts I and II, Adams alleges that Select Quote (1) discriminated against her on the basis of disability "in regard to compensation, leave, and other terms, conditions, and privileges of employment," and (2) failed to provide her a reasonable accommodation. (*Id.* at PageID.7 ¶¶ 40, 41, PageID.9 ¶¶ 59, 62 (implicitly and explicitly referencing 42 U.S.C. § 12112(a), (b)(5)(A) and M.C.L §§ 37.1202(1)(b), (c), 37.1210(1), 37.1102(2)).) Accordingly, Adams seems to allege both a

6

general disability discrimination claim and a specific failure to accommodate claim. Both claims require Adams to establish that she had a disability within the meaning of the ADA and PWDCRA. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319–320 (6th Cir. 2019) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–892 (6th Cir. 2016));[3] *Root v. Decorative Paint, Inc.*, No. 23-3404, 2024 WL 4024426, at *3 (6th Cir. Sept. 3, 2024) (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018)) (explaining that a plaintiff must show that they are an individual with a disability for an ADA failure-to-accommodate claim); *Scott v. City of Detroit*, No. 348516, 2020 WL 2505385, at *4 (Mich. Ct. App. May 14, 2020) (per curiam) (citing M.C.L. §§ 37.1202(1)(b) and 37.1102(2)) ("Both a disability-discrimination claim and a failure-to-accommodate claim require the plaintiff to show the existence of a 'disability.'"). However, Adams fails to plausibly allege that she had a disability under the ADA or PWDCRA.

---

[3] Adams does not provide direct evidence that Select Quote discriminated against her on the basis of disability in regard to compensation, leave, or other terms, conditions, and privileges of employment. Accordingly, the Court construes the general disability discrimination claims as trying to prove discrimination through circumstantial evidence.

7

Under the ADA, a "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual;" "a record of such an impairment;" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADA provides a non-exhaustive list of major life activities like "caring for oneself," "concentrating," "working," and "the operation of a major bodily function." 42 U.S.C. § 12102(2). Additionally, an individual is "regarded as having such an impairment" if "the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Similarly, under the PWDCRA, a "disability" includes "a determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic" substantially limits at least one major life activity of the individual and is unrelated to the individual's ability to perform the duties of a particular job. M.C.L § 37.1103(d). "Disability" under the PWDCRA also includes (1) a history of said determinable physical or mental

8

characteristic, and (2) being regarded as having said determinable physical or mental characteristic. *Id.* The PWDCRA defines "major life activities" in accordance with the ADA. *See Stevens v. Inland Waters, Inc.*, 559 N.W.2d 61, 64 (Mich. Ct. App. 1996) (adopting the definition of "major life activities" from federal ADA regulations "for purposes of interpreting the [PWDCRA]").

Here, Adams alleges that she "has been diagnosed with anxiety and depression and as a result, . . . has a disability within the meaning of the ADA." (ECF No. 1, PageID.6 ¶ 38.) Adams does not provide support for the contention that she had a disability under federal and state law solely because she has a diagnosis for anxiety and depression.

Adams also alleges that she had a disability "within the meaning of the PWDCRA, in that she had a physical impairment that substantially limits one or more of her major life activities" and that her "disabilities are mental and emotional in nature." (*Id.* at PageID.8 ¶¶ 53, 54.) However, Adams does not allege **how** her anxiety and depression substantially limit one or more of her major life activities; Adams does not even specify which major life activity her conditions limit. At best, Adams alleges that she went on leave for at least a week

9

in February 2022 due to her anxiety and depression. (*Id.* at PageID.4 ¶¶ 20–23.) To the extent that Adams suggests that her anxiety and depression substantially limit her ability to work, she also does not show "that her [alleged] impairment limits her ability to 'perform a class of jobs or broad range of jobs.'" *Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019) (citation omitted). *See also Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 408 (Mich. Ct. App. 1999) (holding that under the PWDCRA, a plaintiff must show that the impairment significantly restricts their ability to perform "at least a wide range of jobs"). Adams does not allege, and the Court cannot reasonably infer, that Adams' anxiety or depression limited her ability to perform a class of jobs or a broad range of jobs. Adams also alleges that she once tried to return to work and experienced vomiting with chest pains. (*Id.* at ¶ 23.) However, Adams does not attribute this incident to her anxiety or depression. Even if she did, that incident, combined with the week of absence from work, are insufficient to show that her anxiety and depression limited her ability to perform a class of jobs or broad range of jobs.

The complaint does not suffice to show that Adams had a disability under the ADA or PWDCRA. Accordingly, the Court **DENIES** Adams' motion for default judgment as to Counts I and II.

## B. Retaliation – ADA and PWDCRA

Counts III and IV of the complaint allege retaliation in violation of the ADA and PWDCRA. (*Id.* at PageID.10–15.) Both the ADA and PWDCRA prohibit discriminating or retaliating against an individual because they have opposed a violation of the respective statutes. 42 U.S.C. § 12203(a); M.C.L. § 37.1602(a). Where, as here, there is no direct evidence of retaliation in violation of the ADA or PWDCRA, the Court analyzes the retaliation claims under the *McDonnell Douglas* burden-shifting framework. *Down v. Ann Arbor Pub. Schs.*, No. 20-2114, 2021 WL 5873166, at *4 (6th Cir. Dec. 13, 2021) (citations omitted). Under the framework, Adams must establish a prima facie case of retaliation. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of retaliation, Adams must demonstrate that "(1) she was engaged in a protected activity, (2) this activity was known by [Select Quote], (3) [Select Quote] took an

employment action adverse to [Adams], and (4) that there was a causal connection between the protected activity and the adverse employment action." *Id.*; *Aho v. Dep't of Corr.*, 688 N.W.2d 104, 108 (Mich. Ct. App. 2004) (stating the elements of a prima facie case of retaliation under the PWDCRA).

Here, Adams alleges that she "repeatedly met with supervisors and HR to discuss the retaliation and discrimination she felt due to her disability." (ECF No. 1, PageID.11 ¶ 71; PageID.14 ¶ 90.) That is protected activity under both the ADA and PWDCRA. *Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 780 (E.D. Mich. 2023) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)) (noting that "protected activity" under the ADA includes complaints to management and informal protests of discriminatory employment practices); *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 464 (6th Cir. 2011) (emphasis in original) (citing M.C.L § 37.1102(1) ("Viewed in the best light to MacDonald, his September 18, 2006, call to Hooper alleged mistreatment *because of his disability,* and this clearly constitutes protected activity."). Adams also alleges that she requested an accommodation. That is protected conduct under the ADA

12

(*Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015)) but not necessarily protected under the PWDCRA. *Noe v. Dep't of Treasury*, No. 342374, 2019 WL 452164, at *5 (Mich. Ct. App. Feb. 5, 2019) (per curiam). Regardless, Adams' allegations show that Select Quote knew of her protected activity because she alleges that she spoke directly with her supervisors and members of Select Quote's human resources department.

However, Adams fails to sufficiently allege either that Select Quote took an adverse employment action against her or that there was a causal connection between her protected activity and any adverse employment action she faced. Under the ADA and PWDCRA, an adverse retaliatory action "must be enough to dissuade a reasonable person from engaging in the protected activity." *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *Grimm v. Dep't of Corr.*, No. 356655, 2022 WL 1595043, at *11 (Mich. Ct. App. May 19, 2022) (per curiam).

Here, Adams alleges that her protected activity "subjected her to further adverse treatment as set forth in the statement of facts and the

threat of being terminated for voicing her concerns." (*Id.* at PageID.11 ¶ 73; PageID.14 ¶ 92.) The "factual allegations" section of the complaint alleges the following adverse employment actions that Select Quote took against Adams: (1) informing Adams that she could not take breaks from 8:00 a.m. to 1:00 p.m., (2) not allowing Adams to take breaks and encouraging Adams to not take lunch and work after hours without pay, (3) reducing Adams' compensation, and (4) not responding to Adams' requests for an accommodation. (*Id.* at PageID.3–5.) For the first three adverse actions, Adams does not allege that these actions occurred after Adams engaged in protected activity. Accordingly, there is no causal relationship between the protected activity and these adverse employment actions.

The fourth alleged adverse action restates Adams' failure to accommodate claim. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) ("Lucas also contends that Grainger took adverse action against him by failing to reasonably accommodate him, by refusing to maintain him on light duty work, and by failing to engage him in an interactive process. But this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected . . .

14

.")." As explained above, Adams cannot maintain a failure to accommodate claim because she has not shown that she had a disability under the ADA or PWDCRA.

Finally, Adams alleges that Select Quote terminated her. (*Id.* at PageID.12 ¶ 75; PageID.14 ¶ 94.) However, the specific allegations in the complaint suggest a theory of constructive discharge. (*See id.* at PageID.5 ¶ 33.) "It is possible for an employee to establish constructive discharge through a showing of the employer's complete failure to accommodate." *Tomlinson v. Krauss-Maffei Corp.*, No. 21-6245, 2023 WL 1777389, at *8 (6th Cir. Feb. 6, 2023). A constructive discharge claim based on a failure to accommodate fails here because, as explained above, Adams has not shown that she had a disability under the ADA or PWDCRA. *See id.* ("Tomlinson's [constructive discharge] argument, however, is premised on claims that we have already established are fatal and accordingly fails at the gate."). Accordingly, the Court **DENIES** Adams' motion for default judgment on Counts III and IV.

## C. Failure to Pay Minimum Wage and Overtime – FLSA

Counts V and VI of the complaint allege violations of the FLSA's minimum wage and overtime provisions. (ECF No. 1, PageID.15–18.) The FLSA requires employers to pay each employee "who in any workweek is engaged in commerce" no less than $7.25 an hour. 29 U.S.C. § 206(a). The FLSA also requires employers to pay employees engaged in commerce an overtime rate of at least one and one-half times their regular rate of pay for hours worked over 40. 29 U.S.C. § 207(a)(1). Under the FLSA, "commerce" means "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

Here, while Adams does not allege that she was engaged in commerce, Adams alleges the following: (1) Select Quote employed Adams; (2) Adams spent a month and a half training and/or testing for her license to sell insurance at the start of her employment; (3) Adams experienced pressure from Select Quote to sell plans not in the best interests of clients; and (4) Adams attended a Zoom meeting where her supervisors stated that anyone who brought up pay concerns would be

16

fired. (*Id.* at PageID.2 ¶¶ 6, 8; PageID.3 ¶ 16; PageID.5 ¶ 28.) Based on these allegations, the Court finds that Adams has sufficiently alleged that she was an employee of Select Quote and engaged in commerce.

Adams alleges that Select Quote "would force her to continue working until [the work] was finished, while at the same time forcing her to stop receiving compensation at the end of her scheduled shift." (*Id.* at PageID.15–16 ¶ 103.) This allegation is sufficient to state a claim for minimum wage violations under the FLSA. Regarding Adams' overtime claim, she alleges that Select Quote did not compensate her for working more than 40 hours in a week. (*Id.* at PageID.17 ¶¶ 113–116.) In her renewed motion for default judgment, Adams claims that she averaged eight hours of overtime per week. (ECF No. 17, PageID.68.) The Court finds that Adams states a legitimate claim for overtime violations under the FLSA. Accordingly, the Court **GRANTS** Adams' motion for default judgment on Counts V and VI.

## D. Retaliation – FLSA

Count VII of the complaint alleges retaliation in violation of the FLSA. (*Id.* at PageID.18–19.) The FLSA prohibits the discharge of or discrimination against an employee "because such employee has filed

17

any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). To establish a prime facie case of retaliation under the FLSA, Adams must prove the same four elements as discussed above with respect to ADA and PWDCRA retaliation, including causation. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011).

Here, Adams fails to establish a causal connection between her protected activity and Select Quote's alleged adverse employment action. Adams alleges that Select Quote terminated her for complaining about her pay. (*Id.* at PageID.18 ¶¶ 122–123.) However, as discussed above, the more specific allegations in the complaint suggest that Adams experienced constructive discharge (*Id.* at PageID.5 ¶ 33), and Adams cannot maintain a constructive discharge claim based on either a failure to accommodate or a decrease in compensation. Accordingly, the Court **DENIES** Adams' motion for default judgment on Count VII.

## E. Damages

### 1. *Economic Damages*

Adams seeks $46,552.00 in economic damages. (ECF No. 17, PageID.68.) That figure includes (1) the difference between the hourly

rate that Select Quote promised Adams when it hired her and what it actually paid her; (2) missed overtime payments; (3) compensation during a period of unemployment; (4) compensation for employment at an hourly rate less than $18; and (5) reimbursement for money that Adams had to withdraw from her savings account. (*Id.* at PageID.68–70.) Adams can recover missed overtime payments and an equal amount in liquidated damages.

Under the FLSA, an employer who violates the minimum wage or overtime provisions of the statute "shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Here, Adams alleges that Select Quote improperly paid her $7.25 an hour for 12 weeks. (*Id.* at PageID.68.) Adams claims that she should have received $18 an hour because that is the rate at which Select Quote hired her. (*Id.*) However, the FLSA only requires an employer to pay a wage no less than the federal minimum wage.[4] Adams' claim for compensation at $18 an hour

---

[4] In her complaint, Adams claims that the FLSA "provides that employers pay such minimum wages as established by state law, should it be higher than the federal minimum." (ECF No. 1, PageID.15 ¶ 102 (citing 29 U.S.C. § 218(a)).) Section 218(a) is a savings clause. *Torres v. Vitale*, 954 F.3d 866, 873 (6th Cir. 2020). It provides

is unrelated to any claim in the complaint. Further, neither the renewed motion for default judgment nor the certification of damages indicates that Select Quote paid Adams less than $7.25 an hour for any hours worked. Accordingly, Adams has not established that she is entitled to any economic damages for a violation of the FLSA's minimum wage provisions.

On the other hand, Adams claims that Select Quote never paid her overtime and that she averaged 8 hours of overtime per week for 12 weeks. (*Id.*) Select Quote should have paid Adams an overtime rate of one and one-half times her regular rate of pay for all hours worked over 40. Therefore, based on a rate of pay of $7.25, her overtime rate should have been $10.88 an hour. Adams provides no evidence for the claim that she averaged 8 hours of overtime per week for 12 weeks. However, at the motion hearing, Adams' counsel detailed his efforts to obtain a response from Select Quote and indicated that he could not obtain payroll records that were in Select Quote's possession. Accordingly, the Court will award Adams 96 hours of overtime (8 hours per week times

that the FLSA shall not "excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established" by the FLSA. 29 U.S.C. § 218(a). The clause does not create a federal mandate that employers pay their employees the higher of the federal minimum wage or a state minimum wage.

12 weeks) at a rate of $10.88 an hour. Adams is entitled to $1,044.48 in missed overtime payments and an equal amount in liquidated damages. 29 U.S.C. § 216(b). The Court awards Adams $2,088.96 for Select Quote's violations of the FLSA's overtime provisions.

Adams has not carried her burden of proving her entitlement to economic damages for her period of unemployment, employment at a rate less than $18 an hour, or money she withdrew from her savings. Adams cites no authority indicating that she can obtain said damages for an employer's violation of the FLSA minimum wage or overtime provisions. The Court declines to award Adams these economic damages.

2. *Non-Economic Damages*

Adams next seeks $75,000 in non-economic damages, consisting of $25,000 for pain, stress, and humiliation and $50,000 for a 110-point decrease in Adams' credit score "due to the failure to meet economic liabilities." (ECF No. 17, PageID.70.) Again, Adams cites no authority indicating that she can obtain non-economic damages for an employer's violation of the FLSA minimum wage or overtime provisions. Further, Adams cites nothing that quantifies the economic loss associated with a

21

110-point decrease in one's credit score. Adams has not met her burden of proof for establishing these damages. Accordingly, the Court declines to award Adams non-economic damages.

3. *Attorneys' Fees and Costs*

Adams seeks $7,013.00 in attorneys' fees and $470.00 in costs. (ECF No. 21, PageID.82; ECF No. 21-2, PageID.90–91.) Under the FLSA, "in addition to any judgment awarded to the plaintiff," the Court must award reasonable attorneys' fees and costs. 29 U.S.C. § 216(b); *Rembert v. A Plus Home Health Care Agency LLC*, 986 F.3d 613, 616 (6th Cir. 2021). Starting with costs, the Court awards Adams $470.00 which consists of a complaint filing fee of $405.00 and service of process fees of $65.00. (ECF No. 21-2, PageID.91.)

Turning to attorneys' fees, "[a] reasonable fee is 'adequately compensatory to attract competent counsel' but 'avoids producing a windfall for lawyers.'" *Id.* (quoting *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004)). "The starting point for the calculation of reasonable attorney's fees is the lodestar approach, in which the number of hours reasonably expended is multiplied by a reasonable hourly rate." *Kritcher v. Prudential Sec., Inc.*, 799 F. App'x 376, 379 (6th Cir. 2020)

22

(citations omitted). The Court has some discretion regarding the reasonableness of hourly rates and hours expended. *Rembert*, 986 F.3d at 616. After calculating the lodestar, the Court "may then adjust the lodestar figure to reflect case-specific considerations, the most important of which is the degree of success that the attorney obtained." *Kritcher*, 799 F. App'x at 379 (citation omitted).

Carla Aikens requests a rate of $625.00 an hour and Austen Shearouse requests a rate of $240.00 an hour. (ECF No. 21-2, PageID.90–91.) At the motion hearing, the Court instructed Adams' counsel to substantiate the requested attorneys' fees with resumes and indicia of experience. Adams' counsel failed to do so. Adams' counsel has not otherwise substantiated Aikens' hourly rate or Shearouse's hourly rate.

To determine the reasonableness of counsel's hourly rates, the Court looks to the 2023 Economics of Law Survey Results produced by the State Bar of Michigan. The survey "requested 2022 income and 2022 billing rate information" from attorneys in the state. State Bar of Mich., 2023 Economics of Law Survey Results 3 (2023), https://perma.cc/N3FZ-2SS9. Federal courts in Michigan routinely use

the survey as evidence of reasonableness in determining attorneys' fees. *See e.g., Clements v. Prudential Protective Servs., LLC*, 100 F. Supp. 3d 604, 617 (E.D. Mich. 2015) (citing *Bell v. Prefix, Inc.,* 784 F. Supp. 2d 778, 783 (E.D. Mich. 2011)). Even though the survey results are based on 2022 hourly rates, the results still guide the Court's analysis considering Aikens and Shearouse worked on this case in 2023 and 2024.

Aikens' requested hourly rate is not reasonable. Aikens is the founding attorney at Carla D. Aikens, P.L.C., a three-attorney firm with its principal office in Downtown Detroit. (*See* ECF No. 17, PageID.62 ¶ 16.) Aikens was admitted to the Michigan bar in July 2006. *Carla Dorsey Aikens*, Reliaguide, https://perma.cc/5F2F-HP7B (last visited February 13, 2025). Aikens' requested hourly rate is at the higher end of many scales and, without substantiation, is not reasonable. *See* 2023 Economics of Law Survey Results at 6–8. Instead, an hourly rate of $400 is reasonable. According to the survey results, $400 an hour is: (1) between the mean and the 75th percentile for lawyers with 16 to 25 years of experience and for lawyers who practice civil litigation or civil rights law, (2) between the 75th and 95th percentiles for lawyers with

24

three full-time attorneys in their office, (3) between the 25th percentile and mean—but closer to the mean than the 25th percentile— for lawyers with their primary office in Downtown Detroit, and (4) at the median for lawyers who practice plaintiff's side employment law. *Id.*

Shearouse's requested hourly rate is reasonable. Shearouse is an associate at Carla D. Aikens, P.L.C who was admitted to the Michigan bar in December 2020. *Austen J. Shearouse*, Reliaguide, https://perma.cc/K2W7-8VDG (last visited February 13, 2025). Shearouse worked on this case from June 2023 to October 2024. (ECF No. 1, PageID.19; ECF No. 21-2, PageID.90–91.) Therefore, Shearouse had 2 to 3 years of experience while working on this case. According to the survey results, Shearouse's $240.00 hourly rate is: (1) between the 25th percentile and median both for lawyers with 1 to 2 years of experience and for lawyers with 3 to 5 years of experience, and (2) below the 25th percentile for associates, for lawyers with three full-time attorneys in their office, for lawyers with their primary office in Downtown Detroit, and for lawyers who practice plaintiff's side employment law, civil ligation, or civil rights law. 2023 Economics of

Law Survey Results at 5–8. Shearouse's requested hourly rate of $240.00 is reasonable.

Turning to the reasonableness of hours expended, the Court considers "whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Woolridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598 (2001). Further, "[t]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G&M Roofing and Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984)).

Here, Adams' counsel submitted a billing invoice "of sufficient detail and probative value" such that the Court can determine with a

26

"high degree of certainty that such hours were actually and reasonably expended" in trying this case. *Imwalle*, 515 F.3d at 553.

Based on the invoice, Aikens expended a reasonable number of hours on this matter. Aikens spent five hours on this matter, consisting of client communication, editing and filing a motion to adjourn, and editing a motion for default. (*Id.*) Accordingly, Aikens' lodestar figure is the product of $400 an hour and 5 hours, or $2,000.

Shearouse generally expended a reasonable number of hours on this matter. Shearouse spent 16.2 hours on this matter, consisting of complaint and motion drafting and filing, client communication, and a court appearance. (*Id.*) However, it was not reasonable for Shearouse to spend 0.7 hours reviewing documents in preparation for drafting the renewed motion for default and 1 hour drafting the renewed motion for default. There is no substantive difference between the original motion for default judgment and the renewed motion. The renewed motion includes nine additional paragraphs at the beginning explaining why Adams' counsel failed to comply with the Court's service orders. (*Compare* ECF No. 10, PageID.34–35, *with* ECF No. 17, PageID.60–62.) The brief in support of the renewed motion is a copy of the brief in

27

support of the original motion, including typographical errors, with minor formatting changes. (*Compare* ECF No. 10, PageID.37–43, *with* ECF No. 17, PageID.64–71.) Further, Shearouse drafted the renewed motion only because this Court denied the original motion for default due to counsel's "failure to comply with the Court's orders on multiple occasions." (ECF No. 16, PageID.58.) At best, it was reasonable for Shearouse to expend 0.5 hours, not 1.7 hours, on preparing to draft and drafting the renewed motion for default. After subtracting 1.2 hours from Shearouse's 16.2 total hours spent on this matter, Shearouse's lodestar figure is the product of $240 an hour and 15 hours, or $3,600.

Finally turning to case-specific considerations that would warrant a reduction in the attorneys' lodestars, Adams obtained partial success in this case. She brought seven claims in total but only prevailed on two. Therefore, the Court must consider (1) whether the claims on which Adams did not prevail were related to the claims on which she succeeded, and (2) whether Adams "achieved a sufficient degree of success to render the hours reasonably expended a satisfactory basis for awarding" attorneys' fees. *Imwalle*, 515 F.3d at 552. Ultimately, the Court should "award only that amount of fees that is reasonable in

28

relation to the success obtained." *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 370 (6th Cir. 2014) (internal quotation marks omitted) (quoting *Isabel v. City of Memphis*, 404 F.3d 404, 416 (6th Cir. 2005)).

First, the claims that Adams prevailed on are unrelated to the claims on which she does not prevail. The Sixth Circuit considers discrimination and retaliation claims related for purposes of awarding attorney fees. *Imwalle*, 515 F.3d at 555. Here, Counts I, II, III, IV, and VII are related as they are based on discrimination or retaliation under the ADA, PWDCRA, and FLSA. However, Counts V and VI are based on FLSA minimum wage and overtime violations, not discrimination or retaliation, and they do not share a common core of facts with Counts I, II, III, IV, and VII. Accordingly, the counts that Adams prevailed on are unrelated to the counts on which she does not prevail.

Second, Adams did not achieve a sufficient degree of success to render the hours reasonably expended a satisfactory basis for awarding attorneys' fees. Adams presented five unique claims: disability discrimination, disability retaliation, failure to pay minimum wage, failure to pay overtime, and FLSA retaliation. She prevailed on two of the five. The billing invoice does not delineate the amount of time the

29

attorneys spent on the successful claims as opposed to the unsuccessful claims. Given the nature of the claims and the proofs required for each, Aikens and Shearouse likely spent significantly less time on the FLSA minimum wage and overtime claims than they did on the discrimination and retaliation claims. Accordingly, the Court reduces each attorney's lodestar by 30 percent. *See Franklin*, 2018 WL 11474571, at *10 (reducing the lodestar by 25 percent "[i]n light of Plaintiffs' limited success in relation to the hours reasonably expended by counsel"); *Miller v. Food Concepts Int'l, LP*, No. 13-CV-00124, 2017 WL 5247542, at *16 (S.D. Ohio Nov. 13, 2017) (reducing a total fee award by 30 percent based on plaintiff's partial success). After adding the attorneys' lodestar figures and reducing by 30 percent, the total attorneys' fees award is $3,920, written mathematically as ($2,000 + $3,600) – (0.3 * ($2,000 + $3,600)) = $3,920.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Adams' motion for default judgment. The Court awards Adams $6,478.96, which consists of $2,088.96 in unpaid overtime, $470.00 in costs, and $3,920.00 in attorneys' fees.

**SO ORDERED.**

<u>**s/ Jonathan J.C. Grey**</u>
Jonathan J.C. Grey
Date: March 29, 2025                      United States District Judge

<u>**Certificate of Service**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 29, 2025.

<u>s/ S. Osorio</u>
Sandra Osorio
Case Manager